**William E. RAFTERY, Sr., Appellee,**

v.

**Katheryn Girvin SCOTT, Appellant.**

**No. 84–1052.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 29, 1984.

Decided March 7, 1985.

---

Michael, District Judge, sitting by designation, concurred and filed opinion.

William M. Kunstler, New York City (Kunstler & Mason, New York City, on brief), for appellant.

Sa'ad El-Amin, Richmond, Va. (Sa'ad El-Amin & Associates, Richmond, Va., on brief), for appellee.

Before HALL and MURNAGHAN, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

MURNAGHAN, Circuit Judge.

In a diversity case brought by a New York citizen, William E. Raftery, Sr., against a Virginia citizen, Katheryn Girvin Scott, a jury in the United States District Court for the Eastern District of Virginia returned a verdict against the defendant of $40,000 in compensatory damages and $10,000 in punitive damages.

The plaintiff and defendant had formerly been married to one another. During their seven year marriage one child, William E.

Raftery, Jr., was born on July 4, 1974. In May 1977, while a divorce decree was pending, Scott, the former wife, left the state of New York with the child. The divorce decree, promulgated on June 6, 1977, one month later awarded custody of the son to Scott. Raftery testified during the trial below that he had been unable to establish Scott's whereabouts until December 1981 when he learned that she had remarried and taken up residence in Henrico County, Virginia. According to Raftery's testimony, he had engaged in efforts to learn Scott's whereabouts because of his desire to foster a parent/child relationship with his son, who was nearly seven years old in late 1981.

In February 1982 Raftery sued in the Circuit Court of Henrico County to enforce visitation provisions of the New York divorce decree. In her answer to the complaint, Scott opposed visitation rights in Raftery, claiming that it would be negative for the child to see him after the long separation. According to evidence which, at this stage of the proceedings, following a verdict for the plaintiff, we must construe in a manner most favorable to the plaintiff, the former wife succeeded in persuading the son that he should not see his father. A clinician at the Henrico County Mental Health Center, to whom the matter had been referred by the Henrico County court after a hearing on October 12, 1982 so that the best interests of the child might be ascertained, concluded, following three meetings with the child, that she was "unable to introduce any positive ideas about his father or visitation in a way that the child could accept due to the overwhelming amount of negative material he has heard about father and visitation."

In February, May, June and July 1983, there followed attempts at structured visits between the father and the son. There then ensued a court hearing in August 1983 growing out of an altercation between Raftery and Albert Scott, the defendant's new husband. At the court hearing, the son refused to speak to his father either in court or after the hearing had concluded.

There was testimony from a psychologist who treated Raftery that he suffered from "reactive depression" triggered by the mother's "conduct toward the son and his relationship with [the son]."

Following the August 1983 hearing, the Henrico County court ordered a reevaluation by the Mental Health Clinic. On September 13, 1983 the clinical director recommended that Raftery "no longer have visitation because of the emotional impact it has on the child."

Subsequently, in December 1983, the state court decided to issue an order permitting structured visitation, with both Raftery and Scott seeking psychiatric evaluations. Those decisions taken in December 1983 have not been effectuated, however, because of the imminence of trial in the present action, in which Raftery sought damages for intentional infliction of mental distress. The case had been commenced by Raftery on February 23, 1983 and was tried to a jury on January 3 through January 5, 1984. There was evidence clearly sufficient to establish that the former wife had engaged in a continuing and successful effort to destroy and to prevent rehabilitation of the relationship between the former husband and their son. The appeal concentrates on two claims, neither asserting that error occurred during the course of the trial, each, rather, disputing the propriety of the case's having come to trial in the first place.

■ First, it is contended that the domestic relations exception should apply to defeat entirely federal diversity jurisdiction. However, the domestic relationship between the parties largely terminated with the 1977 divorce, and the suit concerns not the establishment and implementation of visitation rights but, rather, seeks an award of damages precisely because of acts by the former wife to frustrate whatever domestic relations aspects remained of her relationship with her former husband. If someone who had never been married to Raftery, a family member such as an aunt, a cousin or a grandparent or even a nonrelative such as a child nurse or babysitter,

had set about destroying the relationship between the father and his son, any cause of action arising out of such behavior would not be foreclosed from a hearing in federal court because it partook of some intra-family aspects. As held in *Cole v. Cole*, 633 F.2d 1083, 1087 (4th Cir.1980):

> A district court may not simply avoid all diversity cases having intrafamily aspects. Rather it must consider the exact nature of the rights asserted or of the breaches alleged.[1]

In *Wasserman v. Wasserman*, 671 F.2d 832, 834–35 (4th Cir.1982), we held:

> [H]owever, the torts of child enticement and intentional infliction of emotional distress are in no way dependent on a present or prior family relationship.... Most importantly, appellant is not seeking a determination of entitlement to custody or any other adjustment of family status....

A decision by a federal court not requiring the adjustment of family status or establishing familial duties or determining the existence of a breach of such duties, does not contravene the domestic relations exception to federal diversity jurisdiction. *Kelser v. Anne Arundel County Dept. of Social Services*, 679 F.2d 1092 (4th Cir. 1982) (the action claimed deprivation by the husband of the plaintiff's right to the custody and society of her three minor children, a matter over which the district court did have jurisdiction, exercisable once state custody proceedings were concluded).

Consequently, jurisdiction is not lacking.[2] We, therefore, proceed to the second issue presented by Scott. The claim is made that the assertions by Raftery and the proof at trial really demonstrate only "alienation of the affection" of the child for the parent. In attempting to develop the asserted defense, Scott argues that, even as the rose, alienation of affection by any other name is still the same. Use of other descriptive language for the tort involved such as "intentional infliction of emotional distress" or "wanton, malicious and willful conduct depriv[ing] Raftery of the companionship and care of the couple's minor son" should not, she claims, permit escape from the provisions of the Virginia statute. Ann.Code of Virginia § 8.01–220 (1981). The statute has eliminated the causes of action arising on or after June 28, 1968 for a) alienation of affection, b) breach of promise to marry, or c) criminal conversation. By subsequent addition, the code provision abrogates the civil action for seduction for events arising on or after July 1, 1974. Both parties accepted, for purposes of the case, that

---

**1.** Paraphrasing the language in *Cole v. Cole*, "The duty to abstain from [curtailment or abrogation of a parent/child relationship or even the alienation of a child's affection for his father] does not arise out of or require, in order to give rise to the duty, a present or prior family relation[ship]."

**2.** The concurring opinion, while acknowledging that the law, as it has been laid down in *Cole* and *Wasserman*, permits no other result, expresses a concern that the plaintiff has been given "a ticket to ride serenely past the bar of the domestic relations exception." That, to us, appears to have overlooked two considerations:

(1) A year before Raftery sued in federal court for intentional infliction of emotional distress, he claimed *in a Virginia state court*, the only relief he has sought which would affect a readjustment of the domestic relationship of the parties. He sought enforcement of visitation rights which, in contravention of a state court decree, had been denied him by Scott.

(2) With relief which would adjust the domestic relationship apparently a remote possibility because of Scott's success in turning the son against the father, Raftery only then brought suit in federal court seeking exclusively monetary relief. The domestic relations of the parties would not be affected, regardless of whether, on the merits, Raftery should win or lose. Scott had arguably committed a tort, and she might be poorer if that were established in court (as ultimately was the case). Payment of a judgment, however, cannot reasonably be categorized as an act involving a domestic relationship. Most individual defendants are apt to be married. They cannot escape federal diversity jurisdiction simply by asserting that their wives will be upset if they are forced to pay, or that their relationship with the plaintiffs will be worsened.

Had Raftery been struck by an automobile driven by Scott, or had he sold her goods for which she refused to pay, the one time, fully terminated relationship of husband and wife would not have sufficed to preclude federal diversity jurisdiction.

alienation of affection could not be a basis of recovery.[3]

■ However, Raftery took the position that the facts independently supported a claim for intentional infliction of emotional distress, and we are persuaded that he is correct.[4] The fact that a tort may have overtones of affection alienation does not bar recovery on the separate and distinct accompanying wrongdoing. For example, one might owe a substantial sum of money to a long-time friend. If a third party were to abscond with the money to pay the debt, preventing satisfaction of the obligation, while the friend's affection could well be alienated, that fact would not constitute a bar to recovery of the stolen funds from the malefactor.

■ To put things somewhat differently there might in the instant case have been no diminution in the son's affection for the father. Yet, realizing that the father was not in a position to provide him a home, and appreciating that custody had been awarded to the mother, the son might have concluded that his best interests dictated a display by him of an assumed indifference towards, even dislike for, his father to make life more tolerable at home. The unwarranted breach in the physical relationship and its resulting adverse impact on the father would have entitled Raftery to some damages, even if the affection of his son for him remained unabated.[5]

3. We, therefore, have no occasion to investigate whether the statute, indeed, reaches alienation of the affection of a child, especially one of the same sex, rather than applying only to alienation of the affection of an adult of the opposite sex. However, it should be noted that breach of promise to marry and criminal conversation (and, incidentally, seduction as well) concern such relationships between adults not necessarily or customarily related by blood and application of the doctrine of *noscitur a sociis* (of which *ejusdem generis* is a sub-species) suggests that the term alienation of affection, as employed in the statute, is similarly so restricted. Therefore, there well may remain still viable in Virginia a claim for alienation of the affection of one's child, if indeed one existed prior to June 28, 1968. *See*, however, *Schuppin v. Unification Church*, 435 F.Supp. 603, 609 (D.Vt.1977).

Moreover, indeed, a cause of action for alienation of the affection of one's child may have first come into being in Virginia after June 28, 1968. It may well not have existed prior to that date. Restatement Torts 2d § 699. *See Coulter v. Coulter*, 73 Colo. 144, 150, 214 P. 400, 402 (1923) ("No authority has been brought to our attention that an action for alienation of affections exists, except as growing out of, or connected with, the marriage relation."). In that case the statute could hardly be held to be a bar. Non-existent at the time of the act's passage, a cause of action would be unlikely to have been its target. However, we have no occasion to pursue that possibility.

We may assume, for purposes of the case, that an action for alienation of the affection of a son brought by a father has been abrogated by the statute, or never existed in the first place.

4. Intentional infliction of emotional distress and alienation of affection are two distinct causes of action. Under the former, a plaintiff must establish that the tort is intentional or reckless, the tort-feasor's conduct is outrageous and intolerable, the wrongful conduct and the emotional distress are causally connected and the emotional distress is severe. *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974). To recover for the tort of alienation of affection, at least as it existed prior to the 1968 statutory abolition, outrageous and intolerable conduct or a showing of severe emotional distress were not prerequisites for recovery. Instead, a plaintiff need only show a "malicious" (meaning unjustifiable) interference or an intention that such interference result in the loss of affection. Annotation, *Right of Child or Parent to Recover for Alienation of Other's Affections*, 60 A.L.R.3d 931, 939 (1974), *citing Strode v. Gleason*, 9 Wash. App. 13, 510 P.2d 250 (1973) (allowing compensatory damages against a third party who maliciously alienated the affections of a minor child). Unlike the tort of intentional infliction of emotional distress, alienation of affection also has required an existing family relationship. *See generally*, 9B Michie's *Jurisprudence of Virginia and West Virginia* § 101 (1984); 60 A.L.R.3d 931, 935. Hence, not only are the elements of the two causes of action different, but intentional infliction of emotional distress implies a higher burden of proof than alienation of affection. We have here, therefore, not merely a solitary rose (alienation of affection) but rather a bouquet containing, in addition, the tulip of intentional infliction of emotional distress.

5. An argument that there should be a retrial to effect a reduction in the amounts of the compensatory and punitive verdicts, to strike out such parts thereof as might be wrongly calculated with reference to alienation of affection, irrespective of whether the argument otherwise has any validity, is not open to Scott. She opted for an *all* or *nothing* approach and may not assert a claim that only *some* of the recovery was appropriate.

Without, in any way, suggesting that an action by the son could be maintained against the mother for the adverse consequences of the rupture she occasioned between father and son,[6] still it seems clear that, absent a bar for some reason, altogether independent of the alienation of affection contention, a cause of action should lie for psychological damage flowing from the enforced separation from the father, even, or, indeed, especially if the affection of the father had in no way abated, an entirely plausible possibility. Thus, if such an action were indeed not maintainable, the reason would in no way be the supposed similarity of the claim to one for alienation of affection.

Finally, Scott asserts a public policy argument that a child will suffer from psychological adversities if he is cast in the role of a pawn in a battle inspired by greed for filthy lucre of one of the parents. She urges that we not permit resuscitation of the outlawed action for alienation of affection under the substitute label of intentional infliction of emotional distress. However, the differences in the characteristics of, and of the proof to establish, the two torts act to dissipate the premise of the argument. Sufficient proof must be adduced of intentional infliction and something much more than simply aggravation must be shown to make out a case of emotional distress. The implicit threat of an avalanche of cases, arising whenever one parent makes an uncomplimentary remark about the other, simply is not perceived by us as seriously undermining society or its laws. The harm of deliberate frustration of a close and affectionate relationship between parent and child, which the evidence permitted the jury to find in the instant case, were there no remedy available to a parent who as a result was psychologically damaged strikes us as more potentially a danger to society.

Accordingly, the case was properly submitted to the jury, and no error having been claimed with respect to the evidence or instructions, and the amounts of the verdict for compensatory damages and punitive damages being reasonably related to the tort asserted and proven, the judgment below is

AFFIRMED.

MICHAEL, District Judge, concurring.

In this case, because of the positive statement of the law governing this matter in the Fourth Circuit in *Cole v. Cole*, 633 F.2d 1083 (4th Cir.1980), as the doctrine there laid out was reaffirmed in briefer form in *Wasserman v. Wasserman*, 671 F.2d 832 (4th Cir.1982), I am constrained to concur in the result reached in the majority opinion, albeit with reluctance. This concurrence is predicated on the fact that the law is so clearly set out in *Cole* and *Wasserman* that it must be recognized that both the lawyers and the court below are entitled to rely on that law as it is set out in those cases. This court sits to review cases for asserted error, and, if error be found, to take corrective action. Considered in light of the reasoning of *Cole* and *Wasserman*, the court below did not err in its handling of this case[7], so that no corrective action is appropriate. That being the case, joining the majority opinion affirming the court below would be the

---

6. Nevertheless, in 1981 interspousal immunity came to an end by statute. Ann.Va.Code § 8.01–220.1, signifying the recognition of a profound societal change with regard to the consequences of suits between family members. By the time the son attains majority and is emancipated, and within the time limit established by the appropriate statute of limitations, it may be determined that the relationship between an emancipated son and his parent is not, as a matter of Virginia common law, so subject to adverse consequences as to bar a suit by the son against Scott, especially if the claim is that the parent acted wilfully or maliciously. *Cf. Wor-*

rell v. Worrell, 174 Va. 11, 27–29, 4 S.E.2d 343, 350 (1939); *Brumfield v. Brumfield*, 194 Va. 577, 580–82, 74 S.E.2d 170, 173, 174 (1953); *Smith v. Kauffman*, 212 Va. 181, 185–86, 183 S.E.2d 190, 194 (1971). *See* especially, *Strode v. Gleason*, *supra.*

7. It should be noted that the charge given the jury by the court below could well be a model charge for a jury in a state court case charging intentional infliction of emotional distress. See Joint Appendix, pp. 741, et seq.

usual—and the more comfortable—course. Because of real concerns as to the implications of the doctrine of *Cole, Wasserman,* and the majority opinion in this case, concurrence in the result here is an appropriate course, but those concerns require an explication, as set out *infra.*

First, it cannot be disputed that in *Cole,* in *Wasserman,* and in the instant case, the controversy between the parties ineluctably had its origin in the domestic discord which developed between husband and wife in those three cases. This ultimate fact in these three controversies should not be ignored or overlooked. The majority opinion here implicitly acknowledges the *Wasserman* opinion language to the effect that "the previous marital relationship of the parties and the presumably strong feelings associated with that relationship *may as a factual matter* have contributed to the underlying events and the initiation of this suit; ..." *Wasserman* at 834 (emphasis added). What has happened in all three cases is that the opinions in *Cole* and *Wasserman* and the majority opinion in the instant case have passed by this "factual matter" which contributed to the "initiation of this suit" and have picked up beyond the marital relationship, relegating that initiating fact pattern to outer darkness. Having thus put to one side the ultimate source of the controversy, the opinions go on to find bases for the exercise of federal jurisdiction which in the view of this concurrence strongly undercut the domestic relations exception so fully developed in the previous cases in the federal courts concerning the exception.

In *Cole* and in *Wasserman,* the controversies were directly between husband and wife, or former husband and former wife, while the instant case asserts, in words and in effect, an alienation of the affections of a child for its father by the actions of its mother, the child then being in the custody of the mother, and a resulting intentional infliction of emotional distress on the father by the mother. Leaving aside the thorny question of whether alienation of the affections of a child was ever recognized at common law or by the statutory

law of the Commonwealth of Virginia, the factual distinction between the two previous cases and the instant case is not significant in the analysis herein set out.

In the instant case, the record shows without contradiction that the parties were engaged in domestic relations litigation in the state courts in Virginia and in New York State when this action was brought in federal court. The New York litigation had resulted in husband's obtaining a decree of divorce *a vinculo matrimonii,* the court there reserving questions of visitation and the like for further proceedings. In the Virginia court proceeding, efforts were being made by the court to determine the propriety of the father's visitation, terms to be imposed, etc. While this litigation was ongoing in these two courts, the plaintiff came forward with a suit charging alienation and the tortious offense that the wife had engaged in the intentional infliction of emotional distress on the plaintiff husband. It is essentially on this latter basis of tort that the case was tried in the court below.

Certainly, it is hard to envision any situation between two parties more likely to create emotional distress than the deterioration of the domestic relationship between a husband and wife. It may be taken as given that actions by a spouse in derogation of the marital relationship will produce an emotional distress in the other spouse. Whether that action was taken with malice, wilfully to induce such emotional distress in the other, or was taken with justification, or at least without the necessary malicious intent, is a key issue in determining the existence of the tort of intentional infliction of emotional distress.

Any practitioner in the state courts who ever engaged in any domestic relations work knows with awesome clarity the emotional impetus which such controversies can generate in all the parties involved in such litigation. If one is to change the situation shown in the instant case, and is to assume that the parties are unrelated in any way, it is far less likely that a jury

could conclude that emotional distress was created in the plaintiff by actions of the defendant taken arguably for the purpose of alienating the affections of a child toward this assumed stranger-plaintiff. Only because of the domestic relationship between the parties do we find that high level of emotional reaction which a breakup of the marital relationship, and the consequent acts of the parties, may engender in a plaintiff. In brief, if the case is to proceed on the basis of the intentional infliction of emotional distress, it is inescapable that the former marital relationship, now broken, and the actions taken following that breaking, will be taken into account.

It is true that on a technical basis the tort of intentional infliction of emotional distress can be successfully prosecuted without any reference to the marital relation, and it is on this pivot that *Cole, Wasserman*, and the instant majority opinion turn.

Yet, the record below clearly shows that the jury was advised of the former domestic relationship and of the actions of the mother toward the child and against the interests of the father. Only the most meticulous honing of the differentiation sought to be set out by these three cases can support the leap in logic which says that the domestic relationship between the parties is of no moment in the prosecution of the instant case.

If, for instance, it is assumed that a somewhat impecunious husband comes home to a well-to-do wife one evening, to be advised by her that she and the children are leaving him, one may easily imagine the emotional distress caused by any such event. Certainly, it is an intentional event, so far as the wife is concerned, and it is clearly to be discerned that there may or may not be legally cognizable reasons for her taking this drastic step. If, to complicate the matter further, we assume that the parties lived in reasonable tranquility in Bluefield, Virginia, until this bombshell announcement, husband has only to move across the invisible state line which separates Bluefield, Virginia, from Bluefield, West Virginia, in order to find the necessary diversity of citizenship. They may live two blocks apart after the separation, but the diversity is there. Husband-plaintiff then files suit in the United States District Court for the Western District of Virginia asserting the intentional infliction of emotional distress. Without question, wife will then undertake to indicate that there was no malign motive in her taking this action, that it was not taken with malice, wilfully, etc., and that she had ample justification for doing so. The matter then goes to trial, with husband asserting no fault in this situation, and with wife asserting that he was entirely at fault. This comes very close to defining a divorce action, though brought in the form of a suit seeking relief for an alleged tort. Even if we assume that what remains of the domestic relations exception after *Cole, Wasserman*, and the instant case do not permit the federal court to grant the divorce, the narrow circumscription of that doctrine by those opinions might just as well permit the district court to go to that extent, since essentially the evidence appropriate to determining the status of the parties as to divorce will then be before the court. After all, federal courts still retain chancery jurisdiction. U.S. Const., art. III, § 2, cl. 1. Since the Federal Court will be sitting with diversity jurisdiction, applying the law of the Commonwealth of Virginia in this assumed case, the only bar to the granting of a divorce is whatever remains of the domestic relations exception after *Cole, Wasserman*, and the instant case.

It scarcely seems appropriate to say in effect that such a pattern will occur so rarely that it is not worthy of concern. Whether it will be a rare occasion or one of increasing frequency—which this writer believes will be the case—the decision must turn on the law, and on the effects of that law. In the hypothetical situation posed here, it should also be pointed out that the district court will have before it most, if not all, the evidence appropriate to making findings as to custody, visitation, etc. as well as the appropriate evidence to deter-

mine whether a divorce should or should not be granted, as noted *supra.*

In fact, the emergence of the somewhat recently discovered tort of "intentional infliction of emotional distress" is the catalyst which brings these unfortunate developments into congruence one with the other. It is even more unfortunate that congruence will in effect place the United States District Court in the position of hearing all of the evidence relating to divorce, custody, alimony, and support money, in connection with a determination of the existence or non-existence of the tort alleged, and, assuming existence, the fixing of damages for the tort. Such a projection from *Cole, Wasserman,* and the instant case reduces markedly the domestic relations exception which has been so long and properly recognized in federal jurisdiction.

There are a number of reasons for that domestic relations exception, as previously recognized and clearly explicated in previous cases. First, there is the uncontested fact that the state through its courts has a stronger and more direct interest in the domestic relations of its citizens than does the federal court. Second, there is the fact that throughout the country, so far as investigation has disclosed, each state has set up specialized courts which deal with domestic relations matters, particularly in relation to children. They have vested in their courts jurisdiction over divorce matters, with the ancillary matters of alimony, etc., flowing from that grant of jurisdiction. These and the other factors mentioned in the cases conjoin to indicate that the domestic relations exception in federal jurisdiction is a valid and appropriate exercise of restraint on the part of the federal courts.

If the tort alleged is that of "intentional infliction of emotional distress" with jurisdiction essentially predicated on diversity, as in the instant case, then there will, almost inescapably, be placed before the trier of fact the question of the domestic relations of the parties, principally as a means of showing the degree and intensity of the emotional distress. It is thus difficult to see how one can reach the conclusion that domestic relations do not enter into a suit based on this tort, in any case where a spouse, or former spouse, sues the other for acts during or following the marriage, which acts are related to the marital relationship. Obviously, if the tort is asserted to have been committed by parties who are, or were, not in a domestic relationship, then nothing concerning a domestic relationship comes into the case. In the cases of *Cole, Wasserman,* and the instant case, however, the domestic relationships between the parties were a salient part of the evidence which went to the jury.

More generally speaking, if the logic of *Cole* and *Wasserman* is to be followed, it appears that two conclusions are inescapable. First, it must be concluded that the district court should simply ignore one of the operative facts in the pattern, namely, that the dispute arose out of, or was exacerbated by the break-up of, the marital relationship between the parties. Second, by following this course, the courts are undercutting the domestic relations exception. From a sociological point of view, this may be a desirable result. As to this point, the majority apparently feels that any result other than the one reached by it would leave the plaintiff without remedy for the tort.[8] It should not be thus readily assumed that the state courts, particularly vested with domestic relations jurisdiction, are without power to redress any such tort.

If such a result of narrowing the domestic relations exception is to be brought about, it should be done by the action of Congress, rather than by this whittling away process. It is significant that Congress has accepted the domestic relations exception for over 100 years, without undertaking to reduce it or to change it in any way.

---

**8.** "The harm of deliberate frustration of a close and affectionate relationship between parent and child, which the evidence permitted the jury to find in the instant case, were there no reme-

dy available to a parent who as a result was psychologically damaged strikes us as more potentially a danger to society." Majority Opinion, p. 340.

If this is to continue to be the law governing such matters, then we have, in simple terms, given to the plaintiff in circumstances such as these a ticket to ride serenely past the bar of the domestic relations exception by the simple expedient of alleging "intentional infliction of emotional distress". There is no question that the proof of that tort does not require the proof of a domestic relations factor, but it is equally certain that in these cases the offense arises out of the domestic relations relationship and that the relationship is a salient factor—probably the most salient factor—in showing the degree of emotional distress suffered by the plaintiff. I simply cannot agree that the plaintiff, for future cases, under these circumstances should be permitted to avoid the exception.

As set out above, the law in this Circuit is so clearly stated that the writer is forced to concur in the result reached in the majority opinion.

I concur.