Brenda J. HILDEBRAND, individually and derivatively on behalf of The Iron Works, Inc., Plaintiff,

v.

Pleasant A. LEWIS III, and The Iron Works, Inc., Defendants.

No. CIV.A. 03–740–A.

United States District Court, E.D. Virginia, Alexandria Division.

Sept. 10, 2003.

Kathleen Joanna Lynch Holmes, Richards McGettigan Reilly & West P.C., Alexandria, VA, for Plaintiff.

Edward Jay Tolchin, Fettmann, Tolchin & Majors P.C., Fairfax, VA, for Defendants.

## *MEMORANDUM OPINION*

ELLIS, District Judge.

This stockholder derivative action involves breach of fiduciary duty and conversion claims concerning a corporation jointly owned by feuding former spouses. The following threshold jurisdictional questions are presented:

(i) whether the judicially-created domestic relations exception to federal jurisdiction divests a federal court of jurisdiction where, as here, plaintiff, whose ownership interests in the corporation originate from a marriage dissolution separation agreement, asserts shareholder claims under Virginia corporate law, and

(ii) whether the corporation should be realigned as a party plaintiff, as plaintiff requests, thus establishing the requisite diversity of citizenship between the parties.

Each of these questions is addressed below.

### I.

Plaintiff Brenda J. Hildebrand (Hildebrand), a Virginia resident, sues her former husband, defendant Pleasant A. Lewis III (Lewis), a Florida resident, for breaches of fiduciary duty and conversion. The allegations of the complaint are easily summarized and must be accepted as true for purposes of resolving the threshold dismissal motions in issue.[1]

Hildebrand and Lewis were married in 1990. During and for two years prior to

---

1. *See DeBauche v. Trani,* 191 F.3d 499, 505 (4th Cir.1999) (recognizing that the allegations of the complaint must be accepted as true on a threshold motion to dismiss) (citing *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

their marriage, Hildebrand and Lewis were jointly involved in the ownership and operation of several gymnasiums in Virginia and elsewhere, including The Iron Works, Inc. (Iron Works), a Virginia corporation trading as Gold's Gym in Alexandria, Virginia. After approximately ten years of marriage, Hildebrand and Lewis decided to separate. In a Separation Agreement dated October 26, 2001, they agreed to be the sole shareholders and directors of Iron Works following their separation, with Hildebrand to be 49.9% owner, and Lewis to be 50.1% owner.[2] The Separation Agreement also allocated the parties' ownership interests in two other gyms they owned jointly in Altamonte and Winter Springs, Florida,[3] and in any future gyms they might open following their separation.

Under the terms of the Separation Agreement, the parties agreed that Hildebrand would continue to work as an employee for Iron Works and the two Florida gyms. As such, she was to be responsible for various administrative duties assigned to her by Lewis, including personnel, payroll, tax and bookkeeping duties. Lewis, on the other hand, was to be responsible for the overall management and operation of all three gyms. The Separation Agreement further provided that both Hilde-

brand and Lewis were to receive equal annual salaries from Iron Works[4] and, in the event Hildebrand failed to perform her designated duties, Lewis had the right to employ an administrative manager in Hildebrand's stead and to claim Hildebrand's salary for himself. The Separation Agreement further required that the net taxable income of Iron Works and the other gym entities be distributed monthly to the shareholders—namely Hildebrand and Lewis—in accordance with their respective ownership interests.

In November 2001, following execution of the Separation Agreement, Iron Works entered into an agreement with its landlord to terminate its lease of commercial space on South Gate Drive in Alexandria, Virginia. Pursuant to that agreement, the landlord paid Iron Works $1,100,000.00 as a "termination fee." Iron Works thereafter sought new space to continue to operate its gym within the territory prescribed under its franchise agreement with Gold's Gym. Iron Works eventually identified a building located at 7700 Richmond Highway, Alexandria, Virginia, which its owner, Hechinger, Inc., offered to rent to Iron Works at the rate of $8.00 per square foot. Lewis, Hildebrand and Hechinger all contemplated an agreement under which Lewis and Hildebrand would purchase, rather

2. Iron Works was originally incorporated by Lewis in 1984. At the outset, Iron Works issued 2,000 shares of stock, all in the same class, to Lewis, its sole shareholder. Iron Works thereafter entered into a Franchise Agreement with Gold's Gym, Inc. and began operating under the name Gold's Gym at a leased commercial space located at 2960 South Gate Drive, Alexandria, Virginia. Although Hildebrand was involved in the operation of the Alexandria gym throughout the parties' marriage, Lewis continued to be the sole shareholder of Iron Works until the execution of the October 26, 2001 Separation Agreement.

3. Prior to the Separation Agreement, Hildebrand and Lewis owned equal shares of the

Altamonte and Winter Springs gyms. Yet, in the Separation Agreement, the parties agreed that Lewis would own 60% of all outstanding shares of the Altamonte gym and 50.1% of all outstanding shares of the Winter Springs gym, while Hildebrand would own the remaining 40% and 49.9% of the Altamonte and Winter Springs shares, respectively.

4. Specifically, the Separation Agreement provided on this point that:

For each separate Gym where both parties are shareholders...[Lewis] and [Hildebrand] shall each be paid an equal yearly salary from such Gym, such salary to be set by [Lewis]... The parties acknowledge that [Lewis] shall have the right at his sole discretion to adjust these salaries.

than lease, this building. Accordingly, pursuant to a letter of intent, Hildebrand later provided $100,000 to secure the purchase of the building from Hechinger.

In the Spring of 2002, during the course of these negotiations, Lewis unilaterally reduced Hildebrand's hours by half and applied half of her salary to his. He later terminated Hildebrand's employment with Iron Works and the other gyms and applied the remaining half of her former salary to his. Lewis also excluded Hildebrand from the subsequent purchase of the new gym site from Hechinger. Instead, it appears Lewis and others formed a limited liability corporation—3 MAG, LLC (3 MAG)—to act as the purchaser of the building. Then, following the purchase of the new gym site, Lewis, on behalf of both 3 MAG and Iron Works, entered into a lease agreement that required Iron Works (i) to pay rent to 3 MAG at the rate of $9.00 per square foot, (ii) to pay management fees of 4%, (iii) to pay administrative fees of 3%, and (iv) to use the $1,100,000.00 termination fee paid to Iron Works by its former landlord to construct improvements to the building to make it suitable for use as a gym. According to Hildebrand, this lease transaction was not in Iron Works' best interest and instead unduly benefitted 3 MAG and Lewis personally.

Thereafter, in September 2002, Lewis, without the knowledge or approval of the Board of Directors or shareholders of Iron Works, authorized transfers of funds totaling approximately $75,000 from Iron Works to P & BL Gyms, Inc. and P & BL Gyms ALT, Inc., two additional entities in which Lewis has an ownership interest. Lewis also improperly withheld Iron Works distributions from Hildebrand and, in some instances, applied Hildebrand's share of distributions to his own account.[5] Additionally, Lewis paid various personal expenses, including personal attorney's fees, from Iron Works corporate funds.

On January 21, 2003, the Circuit Court for Fairfax County entered a Final Decree of Divorce for Hildebrand and Lewis that "ratified, affirmed and incorporated" the October 26, 2001 Separation Agreement. Several months later, on June 6, 2003, Hildebrand filed this shareholder derivative action against Lewis and Iron Works, alleging three causes of action, namely (i) breach of fiduciary duty in violation of Va.Code § 13.1–692 (Count I), (ii) breach of fiduciary duty in violation of Va.Code § 13.1–691 and § 13.1–725 (Count II), and (iii) conversion (Count III).[6] Specifically, in Count I Hildebrand claims that Lewis breached his fiduciary duty to Iron Works by failing to make distributions to Hildebrand at the time he made distributions to himself,[7] and by failing to obtain the approval, consent, authorization or ratification of such distributions from the Iron

5. Specifically, Hildebrand alleges that as of April 2003, Lewis had made the following distributions from Iron Works to himself without making equal distributions to Hildebrand: (i) a single payment of $14,000 on December 18, 2002 (check no. 425); (ii) two payments of $20,000 on January 8, 2003 (check nos. 527 and 528); (iii) two payments of $50,000 on January 27, 2003 (check nos. 625 and 626); (iv) two payments of $40,000 on March 6, 2003 (check nos. 762 and 763); and (v) two payments of $40,000 on April 25, 2003 (check nos. 908 and 909).

6. Hildebrand, as the owner of less than 50% of the shares of Iron Works, has insufficient voting power to remove Lewis from the Iron Works Board of Directors. Moreover, Article III of Iron Works' bylaws direct that the "Board of Directors shall consist of two members," namely Hildebrand and Lewis, and that "a majority of the entire Board shall constitute a quorum for the transaction of business."

7. Pursuant to Va.Code § 13.1–638, "[a]ll shares of a class shall have preferences, limitations and relative rights identical with those of other shares of the same class...."

Works Board of Directors. In Count II, Hildebrand claims that Lewis, as a director of Iron Works with indirect interests in 3 MAG, P & BL Gyms and P & BL Gyms ALT, had a duty to safeguard the interests of Iron Works in connection with its transactions with these additional entities and to seek the approval, authorization or ratification of the Board of Directors regarding any transactions between Iron Works and these entities. Hildebrand also claims in Count II that the lease transaction with 3 MAG qualifies as an "affiliated transaction" under Va.Code § 13.1–725 and, as such, is a prohibited transaction absent the approval of any disinterested directors—in this case Hildebrand. Finally, in Count III, Hildebrand alleges that in making wrongful distributions to himself, Lewis converted to his own personal use property belonging to Iron Works and Hildebrand. As requested relief, Hildebrand seeks, *inter alia,* the removal of Lewis from the Iron Works Board of Directors and the recovery of monetary damages incurred by Iron Works and Hildebrand by reason of Lewis' breaches of fiduciary duty and conversion.

On July 1, 2003, Lewis moved to dismiss the case for lack of jurisdiction, claiming that this case falls squarely within the judicially-created domestic relations exception to the federal diversity statute. Not to be outdone, Hildebrand also filed two threshold motions, one to realign Iron Works as a party plaintiff and the other to disqualify Lewis' counsel. Thereafter, in opposing Hildebrand's motion to realign Iron Works as a plaintiff, Lewis filed a second motion to dismiss, this time citing the absence of diversity of citizenship between the parties. These pending motions are addressed in order.

## II.

Lewis' motion to dismiss pursuant to the judicially-created domestic relations exception to the federal diversity statute must be addressed first, for were he to prevail on this motion, dismissal would follow and it would be unnecessary to consider the other motions.

The Supreme Court addressed and clarified the scope of the domestic relations exception to federal jurisdiction in *Ankenbrandt v. Richards,* 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). There, the Court held that the exception "encompasses only cases involving the issuance of a divorce, alimony, or child custody decree...." *Id.* at 703, 112 S.Ct. 2206. More specifically, the Supreme Court construed the domestic relations exception narrowly, divesting federal courts of the power only *"to issue* divorce, alimony, and child custody decrees." *Id.* (emphasis added); *see also Cole v. Cole,* 633 F.2d 1083, 1087 (4th Cir.1980) ("the district courts have no original diversity jurisdiction to grant a divorce, to award alimony, to determine child custody, or to decree visitation"). In emphasizing the limited scope of this long-established exception to diversity jurisdiction,[8] the Supreme Court reasoned that it

---

**8.** Indeed, the Supreme Court first recognized the domestic relations exception more than 140 years ago, in *Barber v. Barber,* 21 How. 582, 62 U.S. 582, 16 L.Ed. 226 (1858). And even then, the exception was construed narrowly, as *Ankenbrandt* recognized:

Barber itself disclaimed federal jurisdiction over a narrow range of domestic relations issues involving the granting of a divorce and a decree of alimony...The *Barber* Court thus did not intend to strip the federal courts of authority to hear cases arising from the domestic relations of persons unless they seek the granting or modification of a divorce or alimony decree. The holding of the case itself sanctioned the exercise of federal jurisdiction over the enforcement of an alimony decree that had been properly obtained in a state court of competent jurisdiction.

*Ankenbrandt,* 504 U.S. at 701–02, 112 S.Ct. 2206.

"makes far more sense to retain the rule that federal courts lack power to issue these types of decrees because of the special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of such decrees." *Ankenbrandt,* 504 U.S. at 703–04, 112 S.Ct. 2206.

■ Thus, both *Ankenbrandt* and earlier Fourth Circuit precedent teach that the jurisdictional determination underlying the domestic relations exception must be based on the nature of the claim at issue, not merely the relationship between the parties. *See Raftery v. Scott,* 756 F.2d 335, 338 (4th Cir.1985) ("[a] district court may not simply avoid all diversity cases having intrafamily aspects. Rather it must consider the exact nature of the rights asserted or of the breaches alleged") (quoting *Cole,* 633 F.2d at 1087). Indeed, in *Cole,* cited by the Supreme Court in *Ankenbrandt* as one of the "better reasoned views" in this area,[9] the Fourth Circuit stated the following:

> where alleged breaches (whether tortuous or contractual in nature) are of a duty which does not arise solely from family relations law, a federal district court may not deny jurisdiction simply on the grounds of the supposed etiology of the emotions underlying either the alleged breach by the defendant or the decision by the plaintiff to bring suit.

*Cole,* 633 F.2d at 1088. The Fourth Circuit further recognized in *Cole* that after a state court has articulated the rights of the parties in a divorce decree or otherwise, as was done here, federal courts in diversity cases often must rule on the validity of the prior state action or must determine the existence of a breach of the duties established in that action.[10] It is clear that the exercise of federal diversity jurisdiction in such cases is entirely proper, and attempts by district courts to hold otherwise have been consistently rejected by the Fourth Circuit.[11]

■ Here, it is undisputed that Hildebrand is suing Lewis personally and derivatively on behalf of Iron Works for breaches of fiduciary duty and conversion of funds relating to Lewis' alleged mismanagement of Iron Works. To be sure, Hildebrand's and Lewis' interests, rights and duties with respect to Iron Works grow out of the dissolution of their marriage. Yet, contrary to Lewis' contention, it does not follow from this that Hildebrand's claims in this case fall within the narrow confines of the domestic relations exception. Rather, when the focus is fixed on the nature of the asserted claims, as required, it is clear that such claims are based not on the parties' former marital status, but instead on Hildebrand's status under Virginia corporate law as a shareholder, director and employee of Iron Works, and Lewis' corresponding status under Virginia corporate law as sharehold-

9. Indeed, the Supreme Court found *Cole* persuasive since it, like *Ankenbrandt,* "similarly stated the domestic relations exception as narrowly confined to suits for divorce, alimony, or child custody decrees." *Ankenbrandt,* 504 U.S. at 703 n. 6, 112 S.Ct. 2206.

10. *See Cole,* 633 F.2d at 1087 ("Once some other court has articulated such [divorce, alimony, custody or visitation] rights, however, federal courts have often been called on under diversity jurisdiction to rule on the validity of the prior state or foreign judicial action

or to determine the existence vel non of a breach of the duties established in that action, especially where the duties are no longer subject to modification.") (citations omitted).

11. *See Cole,* 633 F.2d at 1088 (stating that "incorrectly, in seeking to expand the exception to federal jurisdiction, district courts have...referred more globally to exceptions grounded on 'the domestic relations nature' of a case,...or to 'a judicial exception to federal jurisdiction...with respect to intrafamily feuds'").

er and director of Iron Works. Simply put, Hildebrand's claims do not trigger application of the domestic relations exception because they are based on Virginia corporate law and do not seek issuance or modification of a divorce or alimony decree. Like the claims in *Cole,* which also did not warrant application of the exception, Hildebrand's claims "could have arisen between strangers, and certainly between people with no marital relationship whatever." *Cole,* 633 F.2d at 1089.

Again, that the parties' ownership in Iron Works and corporate duties originated in a separation agreement, later incorporated in a state-issued divorce decree, does not remove this case from the realm of federal diversity jurisdiction.[12] This is so because it is not the origin of the parties' corporate interests and duties that matters for jurisdictional purposes; it is the nature of the claims that is dispositive. *See Raftery,* 756 F.2d at 338. And here, Hildebrand's claims seek to vindicate the shareholder rights that she possesses under Virginia corporate law. Thus, because Hildebrand does not herein seek the issuance or modification of a divorce or alimony decree, or "a determination of entitlement to custody or any other adjustment of family status," Lewis' motion to dismiss based on the domestic relations exception to federal jurisdiction must be denied.[13] *Wasserman v. Wasserman,* 671 F.2d 832, 835 (4th Cir.1982); *see also Ankenbrandt,* 504 U.S. at 703, 112 S.Ct. 2206. Indeed, to hold otherwise would essentially strip federal courts of diversity jurisdiction any time a contract or decree with familial ties is required to be referenced or interpreted

---

**12.** *See, e.g., Massey v. Massey,* 1996 U.S. Dist. LEXIS 15456, at * 7 n. 2 (E.D.Va. Aug. 5, 1996) (Smith, J.) (finding that an action to enforce a divorce property settlement agreement did not fall within the domestic relations exception to federal diversity jurisdiction); *Rahnema v. Mir–Djalali,* 742 F.Supp. 296, 301 (E.D.Va.1990) (finding diversity jurisdiction in an action alleging breach of an oral agreement that occurred in the midst of a contested divorce proceeding).

**13.** And, despite his contentions, Lewis has failed to identify any controlling or persuasive authority to the contrary. For example, although Lewis relies on *McLaughlin v. Cotner,* 193 F.3d 410 (6th Cir.1999), that case is distinguishable in that it involved a claim for breach of contract arising out of an agreement to sell a marital residence, which agreement was part of a separation agreement that was later incorporated in a final divorce decree. The instant case, on the other hand, involves claims under Virginia law for breach of fiduciary duties and conversion arising out of certain corporate shareholder rights, which rights just happen to have been granted in a separation agreement. The court in *McLaughlin* was also persuaded to apply the domestic relations exception given that a parallel action regarding the sale of the marital residence was then pending in state court.

No such parallel state action exists in this case. Lewis also cites *Oliva v. Boyer,* 163 F.3d 599, 1998 WL 637405 (4th Cir. Sept. 11, 1998), where the Fourth Circuit affirmed a district court's order dismissing an action under the domestic relations exception, stating only that "Oliva seeks review of state court proceedings regarding domestic relations orders, which is not a basis for federal jurisdiction." *Id.* at *1, 163 F.3d 599. Yet, because the Fourth Circuit provides absolutely no explanation of the facts or law underlying its decision in *Oliva,* this one-paragraph, unpublished, per curiam decision does not warrant dismissal of the instant action under the domestic relations exception. Lewis next relies on *In re Evans,* 278 B.R. 407 (D.Md.2002), which is equally unpersuasive given that it, like *McLaughlin,* involved a parallel state action for modification of a separation agreement, related specifically to child expense and custody issues. Finally, Lewis relies on *Mazur v. Woodson,* 932 F.Supp. 144, 148–49 (E.D.Va.1996), which extended the domestic relations exception to an action challenging the validity and regularity of a state-ordered guardianship decree, holding that "guardianship of an adult because of mental illness or incapacity is analogous to child custody situations." Yet, because it involves state guardianship issues, *Mazur* is unpersuasive and inapposite to the instant case.

in any respect, a result which would expand the narrowly-construed domestic relations exception far beyond its intended scope.[14]

## III.

The next issue in the analysis is whether Iron Works, initially named by Hildebrand as a defendant, should be realigned as a party plaintiff, as Hildebrand requests, thus creating the requisite diversity of citizenship between the parties. Absent such a realignment, the requisite diversity does not exist[15] and dismissal is required.

 Consideration of the realignment issue requires an examination of the legal principles governing the proper alignment of parties in civil actions—particularly stockholder derivative suits—for purposes of determining diversity of citizenship. The first principle is that "[d]iversity jurisdiction cannot be conferred upon the federal courts by the parties' own determi-

nation of who are plaintiffs and who defendants." *Indianapolis v. Chase National Bank*, 314 U.S. 63, 69, 62 S.Ct. 15, 86 L.Ed. 47 (1941). Rather, it is the role of any federal court[16] to look beyond the pleadings and arrange the parties on the appropriate sides, ensuring that "the necessary collision of interests exists." *Id.* at 69, 62 S.Ct. 15.[17] This arrangement must be ascertained from the "principal purpose of the suit and the primary and controlling matter in dispute." *Id.* In other words, as recognized by the Fourth Circuit, a court must (i) determine the primary issue in controversy in the litigation, and (ii) align the parties with respect to this primary issue. *See United States Fidelity & Guaranty Co. v. A & S Mfg.*, 48 F.3d 131, 133 (4th Cir.1995).

 The next relevant principle is that a claim asserted by a stockholder in a stockholder derivative suit is not her own; instead, the claim belongs to the corpora-

14. The absurdity of Lewis' argument is further underscored by the fact that the instant Separation Agreement is binding not only on Lewis and Hildebrand, but also on "their respective heirs, successors, executors, personal representatives, and assigns," as well. Thus, to accept the argument advanced by Lewis would render federal courts forever without jurisdiction to hear any contractual dispute arising out of any of the rights established or granted in the Separation Agreement, a nonsensical result which finds no support in the law. Also noteworthy is the fact that the Final Decree of Divorce in this case only "ratified, affirmed and incorporated" the Separation Agreement, and expressly stated that the Separation Agreement was "not merged" into the decree. As recognized in *Doherty v. Doherty*, 9 Va.App. 97, 383 S.E.2d 759, 760 (1989), "[w]here the circumstances are such that the agreement, although incorporated or approved in the decree, is not merged therein, the parties may enforce it by suing on the agreement rather than on the judgment." Indeed, the instant Separation Agreement provides that "this Agreement shall independently remain in full force and effect, and shall survive any decree, order, or

judgment hereafter entered and shall forever be binding and conclusive upon the parties." Thus, under settled Virginia law, Hildebrand may properly sue under the Separation Agreement given that it was not merged in the Final Decree of Divorce. *Id.*

15. As noted *supra*, both Hildebrand and Iron Works are citizens of Virginia, while Lewis is a citizen of Florida.

16. It is axiomatic that subject matter jurisdiction can be challenged at any time, either by the parties or by the court *sua sponte*. *See* Rule 12(h)(3), Fed.R.Civ.P.; *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir.1999) (recognizing that "a federal court is obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction") (citations omitted).

17. In this regard, it is clear that "jurisdiction of the Court depends upon the state of things at the time of the action brought, and that after vesting, it cannot be ousted by subsequent events." *Smith v. Sperling*, 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957) (citation omitted).

tion and the plaintiff stockholder is merely "a nominal plaintiff." *Koster v. Lumbermens Mutual Casualty*, 330 U.S. 518, 523, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); *Reilly Mortgage Group, Inc. v. Mount Vernon Savings and Loan Assoc.*, 568 F.Supp. 1067, 1073 (E.D.Va.1983). Even so, the complaining stockholder often names the corporation as a defendant in a derivative action, as was done here, to ensure the presence of an indispensable party in the litigation.[18] *See, e.g., Liddy v. Urbanek*, 707 F.2d 1222, 1223 (11th Cir.1983); *Reilly*, 568 F.Supp. at 1073. Thereafter, once the corporation is properly joined in the suit, it can then be realigned as a plaintiff, if appropriate, in accordance with its true interests in the litigation. *See Indianapolis*, 314 U.S. at 69, 62 S.Ct. 15 (recognizing that federal courts must "look beyond the pleadings, and arrange the parties according to their sides in the dispute") (citations omitted).

■ The third relevant legal principle is that corporations are typically aligned as plaintiffs in stockholder derivative actions, since they stand to benefit from a successful suit. *See, e.g., Reilly*, 568 F.Supp. at 1073 (citations omitted). Yet, a well-settled exception to this general rule applies when a corporation is under a control "antagonistic" to the stockholder plaintiff's rights. *See Koster*, 330 U.S. at 523, 67 S.Ct. 828 (recognizing that a corporation is properly aligned as a defendant in a shareholder derivative suit when the corporation is "in antagonistic hands") (citing *Doctor v. Harrington*, 196 U.S. 579, 25 S.Ct. 355, 49 L.Ed. 606 (1905)). In such cases, the antagonistic corporation is properly aligned as a defendant, even if doing so happens to destroy the presence of diversity of citizenship between the parties.

■ The question whether a corporation is sufficiently antagonistic to the plaintiff stockholder so as to be aligned as a defendant is "a practical, not a mechanical determination, and is resolved by the pleadings and the nature of the dispute." *Smith*, 354 U.S. at 97, 77 S.Ct. 1112.[19] Indeed, "[t]he [complaint] and answer normally determine whether the management is antagonistic to the stockholder." *Smith*, 354 U.S. at 96, 77 S.Ct. 1112. In this regard, the Supreme Court has recognized that antagonism is present "whenever the management is aligned against the stockholder and defends a course of conduct which [the shareholder] attacks." *Smith*, 354 U.S. at 95, 77 S.Ct. 1112. This would be the case, for example, when the plaintiff stockholder complains that the management of a corporation has committed a breach of fiduciary duty or fraud. *See id.* (recognizing that when antagonism is present, "[t]he charge normally is cast in terms of fraud, breach of trust, or illegality") (citations omitted).[20]

---

**18.** Courts in this district have long recognized that "a corporation is an indispensable party in a shareholder derivative action suit." *See Gibson v. BoPar Dock Co. Corp.*, 780 F.Supp. 371, 373 (W.D.Va.1991) (citing *Tower Hill Connellsville Coke Co. v. Piedmont Coal Co.*, 33 F.2d 703, 706 (4th Cir.1929), *cert. denied*, 280 U.S. 607, 50 S.Ct. 157, 74 L.Ed. 650 (1930)); *Bates v. Cekada*, 130 F.R.D. 52, 59 (E.D.Va.1990) (recognizing that "the corporation is always deemed to be an indispensable party" in a shareholder derivative action) (citations omitted); *Taylor v. Swirnow*, 80 F.R.D. 79, 82 (D.Md.1978) (recognizing that "in a derivative action the corporation for whose benefit suit is brought is a necessary party to the action") (citations omitted).

**19.** *See also Fidelity*, 48 F.3d at 134 ("Antagonism between parties should be resolved by the pleadings and the nature of the controversy") (citing *Smith*, 354 U.S. at 97, 77 S.Ct. 1112); *Fidelity*, 48 F.3d at 134 ("[t]he pleadings and the nature of the suit clearly manifest the proper alignment of the dispute").

**20.** Put another way, the requisite antagonism between the stockholder and the management of a corporation is present "where the dominant officers and directors are guilty of fraud

This is precisely the case presented here: Lewis, as the majority shareholder, appears to have complete managerial control over Iron Works, particularly given the proxy granted to him by Hildebrand in the Separation Agreement.[21] And, given the instant allegations of breach of fiduciary duty and conversion, the management of Iron Works—namely Lewis—is clearly "antagonistic" to Hildebrand in connection with "the primary issue in controversy." *Fidelity,* 48 F.3d at 133. Moreover, in vigorously opposing Hildebrand's claims in this suit, Lewis is undoubtedly "aligned against" Hildebrand and defending "a course of conduct" which Hildebrand attacks. *Smith,* 354 U.S. at 95, 77 S.Ct. 1112.[22] This, in turn, compels the conclusion that Iron Works is properly aligned as a defendant, as initially pled in the complaint. Accordingly, because Hildebrand and Iron Works are both Virginia citizens, Lewis' motion to dismiss for lack of subject matter jurisdiction must be granted.[23] This conclusion in no way impairs Hildebrand's right to seek vindication of any of her asserted Virginia corporate rights in the appropriate state forum.

An appropriate Order will issue.

---

or misdeeds." *Smith,* 354 U.S. at 95, 77 S.Ct. 1112.

**21.** Specifically, the Separation Agreement provides, in pertinent part, that "Wife grants Husband an irrevocable proxy for all of her shares in the Gyms which proxy shall provide him with full irrevocable management authority."

**22.** In support of her position, Hildebrand argues unpersuasively that the corporation was deadlocked at the time the complaint was filed, and thus, that the requisite antagonism is not present. *See, e.g., Duffey v. Wheeler,* 820 F.2d 1161, 1163 (11th Cir.1987) (recognizing that when "the corporation's management or its shareholders are deadlocked with respect to a particular issue, courts have realigned such corporations as party plaintiffs"); *Gibson,* 780 F.Supp. at 375 (recognizing that where a corporation "is unable to act on its own behalf and *the shareholders* [,] [who are split 50–50,] are deadlocked, the corporation cannot be considered antagonistic to the plaintiff for purposes of realignment of the parties") (emphasis added). Fatal to Hildebrand's argument in this regard is the fact that neither the management nor the shareholders of Iron Works have ever been deadlocked or unable to act; nor are the shareholders' interests split equally. Rather, Lewis has been, and continues to be, the majority shareholder and acting management of Iron Works, able and willing to act on behalf of the corporation. Indeed, it appears that since the filing of the instant complaint, Lewis has refused to vote Hildebrand's shares under the proxy and has instead exercised his management authority to remove Hildebrand from the Board of Directors.

**23.** Given this ruling, it is unnecessary to address Hildebrand's additional motion to disqualify Lewis' counsel.